| | |
|---|---|
| **ARTHUR STAEHLING, and JULIA** ) | |
| **STAEHLING, as guardians,** ) | |
| **next friends and parents of** ) | |
| **JENNA STAEHLING a minor,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **No. 3:07-0797** |
| ) | **Judge Echols** |
| **METROPOLITAN GOVERNMENT** ) | |
| **OF NASHVILLE AND DAVIDSON** ) | |
| **COUNTY** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM

This is an action under 42 U.S.C. § 1983, Title IX of the Education Amendments of 1972

("Title IX"), 20 U.S.C. § 1681, and common law negligence brought by the Plaintiffs Arthur

Staehling ("Mr. Staehling") and Julie Staehling ("Mrs. Staehling"), as guardians, next friends, and

parents of Jenna Staehling ("Jenna"). Defendant, the Metropolitan Government of Nashville and

Davidson County ("Metro"), has filed a Motion for Summary Judgment (Docket Entry No. 50) on

Plaintiffs' federal claims, to which the Plaintiffs have responded in opposition (Docket Entry No.

63). By Order of the Magistrate Judge (Docket Entry No. 74), the United States of America was

allowed to file an amicus brief to argue the appropriate law governing Title IX cases against the

government or governmental agencies (Docket Entry No. 75), to which Defendant has responded

(Docket Entry No. 77).

## I. FACTUAL ALLEGATIONS

Metro has moved for summary judgment, claiming there are no genuine issues of material

fact. However, even a cursory review of the parties' filings and the evidence submitted shows

numerous disputed facts, although none of those are material to the disposition of Plaintiffs' federal

claims. Those disputes will be highlighted after a review of the underlying incident which gave rise to this litigation.

**A. <u>The Incident</u>**

Jenna,[1] a female, is an autistic, special education student attending J. T. Moore Middle School in Nashville, Tennessee. At the time of the events in question, Jenna was 11 years old.

During the 2006-2007 school year, Jenna rode a school bus to and from school each day. The bus was provided by Metro and was designated for special education students. It had two bench seats located directly behind the bus driver. The remaining space in the bus is reserved for students who utilize wheelchairs.

At the time in question, Jenna and four male special education students were assigned to the bus. Mr. and Mrs. Staehling claim that on October 5, 2006, Jenna was subjected to a sexual assault and battery by a fellow special education student while riding the bus home from school. When Jenna arrived home, the Staehlings saw Jenna's pants down below her waist and they asked her what had occurred. Jenna described the incident which allegedly involved a fellow student reaching inside her bra and pants. Mrs. Staehling called the school at 4:25 p.m. to report the incident and spoke with Brenda Garrett ("Ms. Garrett"), the assistant principal at J. T. Moore Middle School.

Following the incident of October 5, 2006, arrangements were immediately made to prevent Jenna from riding the school bus again with the student who was alleged to have committed the assault

---

[1]Generally, the Court does not identify minors by name in cases which raise allegations like those found here. However, the parties repeatedly identify the minor by name and thus there is no need to refrain from naming the minor child.

2

and battery.[2]  Jenna rode the bus to school the day after the incident[3] and continued riding the same school bus thereafter on a regular basis.

**B.  Contentions Regarding Follow-up to Incident and Other Matters**

Metro claims that the day after the incident, Ms. Garrett met with Mrs. Staehling to begin an investigation.  However the Staehlings dispute that either of them met with Ms. Garrett and instead state that Mr. Staehling met with a Metro police officer who was the school resource officer to discuss the matter.  The Metro police officer investigated and told Mr. Staehling he should press criminal charges against the alleged offender.

Metro also claims that following the incident, guidance counselors at J. T. Moore Middle School had confidential counseling sessions with Jenna.  However, the Staehlings claim that while Mrs. Staehling requested counseling for Jenna and signed a document authorizing counseling, they were never informed Jenna ever received any counseling.  Further, Joanne White Wilson, nèe Joanne White ("Ms. White"), Jenna's teacher at the time,  has submitted an Affidavit in which she states Jenna never left her classroom, nor was asked to leave the classroom, to receive counseling.

Metro further claims that Delores Burke ("Ms. Burke"), the then-principal at John T. Moore Middle School, monitored Jenna's behavior and stability following the alleged incident, by observing Jenna in the school cafeteria, in the hallway, and occasionally in the classroom.  Metro also asserts that Ms. Burke discussed Jenna's situation with her teachers and met with Ms. White to express her concerns about Jenna and to check that Jenna was doing well.  However,  Ms. White does not remember Ms. Burke ever monitoring Jenna's behavior in the cafeteria or hallway and

---

[2]After the incident, the alleged assailant was no longer allowed to ride the bus and was ultimately transferred from J.T. Moore Middle School to another school.

[3]In their respective Affidavits, the Staehlings indicate that they allowed Jenna to ride the bus to school because the perpetrator of the assault had been removed and because it is important for autistic children to follow a set routine.

3

recalls that the only time Ms. Burke ever saw Jenna in the hallway was if Jenna's class happened to walk by Ms. Burke on the way to the cafeteria or another class. As for observing Jenna in the classroom, Ms. White remembers Ms. Burke coming to the portable unit in which her class was located only one time, and that was for the purpose of discussing her displeasure with Ms. White on an unrelated issue. The only discussion Ms. White recalls having with Ms. Burke about the incident involving Jenna occurred when Ms. White approached Ms. Burke in the principal's office after learning of the incident from Mr. Staehling.

Metro also claims that prior to the October 5, 2006 incident, the Staehlings did not make any complaints to anyone about the bus, or the number of students on the school bus that Jenna was riding. However, Mr. Staehling claims he saw the same special education student who assaulted Jenna kiss her on the bus on September 26, 2006. Upon witnessing the incident, Mr. Staehling "hollered" at the bus driver, Danielle Beach ("Ms. Beach"), to pay attention to what was going on. He also spoke with Ms. Beach the following day about the kissing incident and asked her to keep an eye on things.[4]

For her part, Ms. Burke claims to not remember having any issues involving the safety of children on special needs buses prior to the incident on October 5, 2006. However, Sandy Burton ("Ms. Burton"), a special education coordinator and a former school bus driver, claims that prior to October 2006, she received twelve to fifteen complaints by parents concerning the safety of their

---

[4]Bus drivers are supposed to draft an incident report and report incidents occurring on their buses to a Metro school official, such as their supervisor or route coordinator. Once an incident is reported on a school bus by a driver, the driver's supervisor or another school official makes a determination about whether the tape in the on-board camera should be downloaded. There is no evidence that this particular incident was reported to supervisors or management officials.

4

children on school buses.[5]  Upon receipt of such complaints, Ms. Burton spoke with employees of the school, including the principal, about how to resolve the complaints.

The Staehlings admit that prior to the incident, they never requested that monitors be placed on the special needs buses.  However, they maintain the need for monitors on buses had been discussed many times by Metro personnel.  Specifically, Dr. Linda Depriest ("Dr. Depriest"), a coordinator for special education in the Metro schools,  expressed her concerns about the need for monitors many times prior to the incident involving Jenna  to Sharon Wright (Ms. Wright"), the Executive Director of Special Education and Kay Rackard ("Rackard"), the Director of Special Education.  Further, Ms. Burton expressed her concerns about the safety of students on buses and the need for monitors to Dr. Depriest, Guy Morgan, the Transportation Manager, Keith Phillips, the Transportation Director, Ms. Wright, Ms. Rackard, and Mr. Marcus Hayes, a special education coordinator, on numerous occasions.  Ms. Burton also expressed the need for monitors on buses with Ms. Tracey DeMoss, the regular education route coordinator for Metro schools.

Plaintiffs also claim that Metro was put on notice of the need for monitors by virtue of notice it received in February 2000 from the Office for Civil Rights of the United States Department of Education.  That notice related to the claim of a student at another school and stated that Metro schools' failure to ensure safety of students in relation to verbal and the potential for physical abuse on school buses could impact the educational services provided to students, thereby denying them an appropriate education.

After the incident in question, Metro claims the Staehlings did not take Jenna to the doctor because of any physical or mental injuries which were received during the alleged assault.  However, the Staehlings claim they attempted to find a doctor who was familiar with autism and sexual

---

[5]Usually, the complaints related to bullying or intimidation.

5

assault.  While it took several months of looking, the Staehlings were eventually able to locate a doctor with the requisite experience and have taken Jenna to a doctor who was referred to them by a Vanderbilt psychiatrist.  Jenna was not seen by that doctor until after this lawsuit was filed.

After the incident, Jenna continued going to school and, in fact, only missed three days of school as a result of the incident.  While Metro claims Jenna's grades did not significantly worsen after the incident, the Staehlings point out that she has dropped off the honor role and has had some problems with learning.

Metro also claims that since the incident, Jenna continued riding the same school bus without a monitor and no incidents occurred.  However, the Staehlings note that, while there may not have been any further incidents, Jenna's bus did in fact have a monitor on it during the 2007-2008 school year.

Apart from the school bus incident, Plaintiffs allege civil rights violations which relate to Jenna and certain other special education students being excluded from school functions, such as field trips.  That is, special education students whose classes were located in portable unitss were allegedly treated differently from other children whose classrooms were in the main part of the school.  Those allegations are the basis of Plaintiffs' equal protection claim.

## C.  <u>Nature of the Claims</u>

As a result of the foregoing, Plaintiffs filed suit asserting three claims.  Plaintiffs first allege Defendants are vicariously liable for negligence under the Tennessee Governmental Tort Liability Act, T.C.A. § 29-20-101, et. seq. because Ms. Beach failed to exercise reasonable care and oversight on the bus, she negligently supervised both Jenna and her attacker, and she failed to properly report the incident.  Second, Plaintiffs claim Jenna's constitutional rights under the Fourteenth Amendment were violated because Defendant was deliberately indifferent in failing to train school employees, hiring Ms. Beach, failing to implement policies to prevent sexual assault, failing to properly

supervise and discipline employees, failing to assign Jenna to a bus with a monitor, assigning Jenna to a bus with other special needs students knowing she could not defend herself, failing to train Ms. Beach as to proper reporting procedures, and permitting Ms. Beach to operate the bus, even though she apparently had a juvenile conviction which was expunged. Finally, Plaintiffs allege a violation of Title IX claiming Defendant knew or was deliberately indifferent to the possibility of sexual assaults on unmonitored buses carrying special needs students which allowed the assault to occur thereby depriving Jenna of the right of access to educational opportunities.

## II. <u>STANDARD OF REVIEW</u>

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Covington v. Knox County School Sys.</u>, 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. <u>See</u> <u>Martin v. Kelley</u>, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. <u>See</u> <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986); <u>Covington</u>, 205 F.3d at 914 (citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to support the nonmoving party's case. <u>Celotex</u>, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence

7

in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### III.  LEGAL ANALYSIS

Defendant moves for summary judgment solely on Plaintiffs' federal claims.  Because the Court finds that Plaintiffs fail to establish factual issues which require trial on their federal claims, the Court will dismiss those claims and decline to exercise supplemental jurisdiction over Plaintiffs' state law negligence claim.

**A.  Claims under 42 U.S.C. § 1983**

Plaintiffs' claims under 42 U.S.C. § 1983 are brought pursuant to the Fourteenth Amendment. Specifically, Plaintiffs allege violation of Jenna's rights under both the Equal Protection and Due Process clauses of the Fourteenth Amendment.

**1.  Equal Protection Clause Claim**

Defendant seeks summary judgment on Plaintiffs' Equal Protection claim arguing that Plaintiffs fail to show any burden on a fundamental right, or that Jenna was treated differently than similarly situated individuals.  In response, Plaintiffs state that upon review of Defendant's arguments and further consideration of the relevant case law, they "do not wish to further occupy the Court's resources and time in pursuing an equal protection claim at this time."  (Docket Entry No. 64 at 8).

"The Equal Protection Clause of the Fourteenth Amendment prohibits a state from denying to any person within its jurisdiction the equal protection of the laws."  S.S. v. Eastern Kentucky Univ., 532 F.3d 445, 457 (6th Cir. 2008).  The Supreme Court has held that this clause "does not forbid classifications," but rather "simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." Nordlinger v. Hahn, 505 U.S. 1, 10 (1992).

"Disabled persons are not a suspect class for purposes of an equal protection challenge," S.S., 532 F.3d at 457, and students receiving special education services are not in a protected class for

8

Equal Protection purposes.  Clark v. Banks, 2006 WL 2456679 at *5 (6th Cir. 2006).  Further, students do not have a fundamental right of a constitutional dimension to be protected from harm by third parties as a result of compulsory school attendance laws because "the parents, not the state, remain the child's primary caretakers."  Sargi v. Kent City Bd. of Educ., 70 F.3d 907, 911 (6th Cir. 1999).  While there are situations where an individual may be a "class of one" for Equal Protection purposes, Plaintiffs fail to show that Jenna has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.  Assoc. of Cleveland Fire Fighters v. City of Cleveland, 502 F.3d 545, 549 (6th Cir. 2007).  Accordingly, summary judgment will be granted in Defendant's favor on Plaintiffs' Equal Protection claim.

**2. Due Process Clause Claim**

As a general proposition, governmental entities are not liable for injuries sustained by private citizens as a result of the citizen's own or another private citizen's conduct.  Deshaney v. Winnebago Cty Dept.  of Soc. Servs., 489 U.S. 189, 196 (1989).  Based on language contained in Deshaney, courts  recognize two exceptions to this general rule.  The first is identified as the "special relationship" exception, while the second is identified as the "state-created danger" exception.

The "special relationship" exception is also known as the "custody exception" and "is premised on an affirmative act that exposes an individual to harm after being placed in a 'special relationship' with the state, such as in an officer's custody."  Schneider v. Franklin County, 2008 WL 2967645 at *4 (6th Cir. 2008).  "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf."  DeShaney, 489 U.S. at 200.

The Sixth Circuit has held that "there is no 'special relationship' between a school and its students that gives rise to a constitutional duty."  McQueen v. Beecher Comm. Schools, 433 F.3d 460, 464 n. 4 (6th Cir. 2006)(collecting cases).  More pointedly, the Sixth Circuit has held that "the

9

absence of such a duty in the classroom where school attendance is mandatory [is] even more compelling in the context of a student's presence on a school bus." <u>Sargi.</u>, 70 F.3d at 911. Accordingly, Plaintiffs cannot state a Due Process violation under the facts of this case based upon the "special relationship" exception to <u>DeShaney</u>.

Alternatively, Plaintiffs seek to hold Defendant liable for alleged Due Process violations based upon the state-created danger exception. "Liability under the state-created-danger theory is predicated upon affirmative acts by the state which either create or increase the risk that an individual will be exposed to private acts of violence." <u>Kallstom v. City of Columbus</u>, 136 F.3d 1055, 1066 (6th Cir. 1998).

In order to establish a state-created danger claim, a plaintiff must show: "(1) an affirmative act by the state which either created or increased the risk that the plaintiff would be exposed to an act of violence by a third party; (2) a special danger to the plaintiff wherein the state's actions placed the plaintiff specifically at risk, as distinguished from a risk that affects the public at large; and (3) the state knew or should have known that its actions specifically endangered the plaintiff." <u>Cartwright v. City of Marine City</u>, 336 F.3d 487, 493 (6th Cir. 2003). With regard to the affirmative act, where there is "opportunity for reflection and unhurried judgment," plaintiff must show deliberate indifference, meaning that the state actor was "'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Arledge v. Franklin County</u>, 509 F.3d 258, 263 (6th Cir. 2007)(citations omitted).

In this case, Plaintiff claims that "the conduct did not happen in an instant[,] but over a period of time through numerous and identifiable affirmative acts by Defendant." (Docket Entry No. 64 at 11). However, Defendant is primarily charged with acts of omission or failures, which Plaintiffs categorize as "a series of obdurate failures[.]" (<u>Id</u>.) Plaintiffs describe those acts in what they state is a "more active voice or affirmative tone" as follows:

Defendant assigned Jenna to a special needs school bus with four male pubescent special needs students. Defendant consciously disregarded all warnings from the OCR [Office of Civil Rights] and its own employees as to the dangers to students on buses with no monitor. These dangers included the possibility of physical harm to students or an incident, such as the one at issue here, occurring on special needs buses. Defendant knew of and disregarded all warnings and risks. Despite the warnings, Defendant decided not to place a monitor on Jenna's bus. Defendant hired a bus driver with a criminal record and allowed this person to be responsible for the well-being of special needs children before performing a background check. Defendant decided to forego the training of Jenna's bus driver as to the proper handling of special needs students. Defendant's bus driver disregarded all surveillance equipment with which she was provided and ignored the actions of the children sitting behind her with whom she was entrusted to supervise.

(Id.)

In the state-created danger context, the critical issue is whether government officials "did anything 'affirmative' to 'embolden' the person causing harm to another." Brooks v. Knapp, 212 Fed. Appx. 402, 406 (6th Cir. 2008)(citing, Jones v. Reynolds, 438 F.3d 685, 703 (6th Cir. 2006)). Thus, failure to act, as opposed to affirmative conduct, does not cause a "state-created danger" to arise. Id. However, because it may be difficult for a court to distinguish between action and inaction, the Sixth Circuit has refined the test by focusing on "'whether [the victim] was safer before the state action than he was after it." Cartwright, 336 F.3d at 493. If a plaintiff cannot identify conduct by the state actor which either created or increased the risk of harm to which plaintiff was exposed, then the conduct is said to "fall[] on the inaction side of the line." Koulta v. Merciez, 477 F.3d 442, 446 (6th Cir. 2007)(collecting cases). Likewise, if a victim is not identifiable at the time of the state action or inaction, a claim under the state created danger exception will not apply. Id. at 447.

In this case, Plaintiffs fail to point to an affirmative act which created or increased the risk of harm to Plaintiff. Instead, they point to alleged failures of Defendant, such as placing special needs students together on a bus without monitors, failing to sufficiently train bus drivers and the bus

driver failing to adequately monitor what was going on behind her. These allegations do not meet the criteria for the state-created danger exception to <u>DeShaney</u>.

In this regard, the Supreme Court's decision in <u>DeShaney</u> is instructive because it illustrates a scenario in which the first element of a state-created danger claim was missing. There, a Due Process claim was brought against the Winnebago County Department of Social Services ("social services") on behalf of a four year old boy after he was severely beaten by his father. In January 1983, social services first learned that the boy's father might be abusing him when the boy, who was covered with bruises and abrasions, was taken by the father's girlfriend to the hospital. A physician notified social services that the boy's injuries were likely the result of abuse. Initially, social services obtained a court order which placed the child in the hospital's custody, but three days later determined that there was insufficient evidence for continued custody and the boy was placed back in his father's care with the recommendation that the child attend a Headstart program and the girlfriend move out of the house. A month later, the boy was taken to the hospital with suspicious injuries and social services was again notified, but concluded there was insufficient evidence to take any action. For the next five months, a caseworker made monthly visits to the boy's home and on several occasions observed suspicious injuries to the boy's head. The caseworker also observed that the boy was not placed in a Headstart program and the girlfriend was still in the house. Nevertheless, social services did not take action. In November 1983, the child was taken to the emergency room where he was treated for a cut forehead, bloody nose, swollen ear, and bruises on both shoulders. Again, emergency room doctors notified social services about their concerns that the child had been the subject of abuse. Still, social services took no actions to protect the boy. Over the next couple of months, the social worker visited the home, but on one occasion was told she could not see the boy because he was in bed with the flu and, on March 7, 1984, was told that a few days before her visit

the boy had fainted in the bathroom. Even still, the social worker did not ask to see the boy. The next day, the boy was beaten into a coma by his father and incurred such injuries that he was rendered profoundly retarded and expected to remain institutionalized for life.

The immense tragedy of the situation was not lost on the Supreme Court. It observed that "[j]udges and lawyers, like other humans, are moved by natural sympathy in a case like this to find a way for [the child] and his mother to receive adequate compensation for the grievous harm inflicted upon them." Id. at 203. Nevertheless, the Supreme Court concluded that "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors." DeShaney, 489 U.S. at 195. Even though the state had taken a somewhat active role in relation to monitoring the child's welfare and received numerous warnings or signals that the boy was being abused by his father, the Supreme Court held that social services did not inflict the harm or create the danger. "The most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." Id. at 203.

Also instructive is the Sixth Circuit decision in Sargi. There, plaintiff's minor child collapsed due to heart failure on her school bus while riding home one afternoon. The bus driver, believing the girl was merely having a seizure, unsuccessfully tried to contact her superiors on her CB radio. The bus driver continued on her route, dropping other children off. By the time the bus reached the child's home, she was not breathing and later died. Her parents filed suit claiming the school district was liable because it failed to provide bus drivers with a plan or policy concerning the management of emergencies on its buses; it instituted a policy of taking seizure victims home without any emergency medical intervention; if failed to maintain properly working communications device on the buses; and it failed to communicate the girl's medical condition to her school bus driver. In

13

finding no Due Process liability, the Sixth Circuit noted that there is a "demanding standard for constitutional liability" and that the "state created danger" theory is predicated on the government's "affirmative acts" which "work[ed] to plaintiff's detriment in terms of exposure to danger." <u>Sargi</u>, 70 F. 3d at 909. The demanding standard was not met because plaintiffs produced no "evidence that the Board took any affirmative action that exposed the decedent to any danger to which she was not already exposed." <u>Id</u>.

Likewise in this case, the situation presented is regrettable. However, Plaintiffs have pointed to nothing which suggests that any affirmative act of the school led to the assault. Instead, it arose as a result of another child's actions. While Plaintiffs point to what may be characterized as derelictions on the part of the school, as was the case in <u>DeShaney</u>, the most that can be said of Metro is that they stood by and did nothing even though prudence may have dictated that they do more. Summary judgment will be granted in Defendant's favor on Plaintiffs' Fourteenth Amendment claims brought pursuant to 42 U.S.C. § 1983.

**B. <u>Title IX Claim</u>**

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). In <u>Davis v. Monroe County Bd. of Educ.</u>, 526 U.S. 629 (1999), the Supreme Court was presented with a peer-on-peer sexual harassment claim under Title IX. In granting certiorari, the Supreme Court aimed "to resolve a conflict in the Circuits over whether, and under what circumstances, a recipient of federal education funds can be liable in a private damages action arising from student-on-student sexual harassment[.]" <u>Id</u>. at 637. Moreover, the Supreme Court was called upon to "determine whether a district's failure

to respond to student-on-student harassment in its schools can support a private suit for money damages." Id. at 638.

After reviewing the legislative history of the act and its prior rulings, the Supreme Court held that a school could be liable for peer-on-peer sexual harassment only if the school was deliberately indifferent. That is, schools "are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." Id. at 650. Liability is cabined by the deliberately indifferent standard since a school is only liable for acts of student-on-student harassment "where the [school's] response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances." Id. at 648.

Under that formulation, the complaint against the school in Davis should not have been dismissed for failure to state a claim where the record showed that the student was the victim of a prolonged pattern of sexual harassment over several months by a fifth-grade classmate (including touching of the breasts and genital area and lewd statements), all of which were duly reported to various authorities of the school.[6] Ultimately the incidents ended after the assailant was charged with sexual battery. However, the victim's grades suffered and she once threatened suicide.

Using Davis as a benchmark, the parties in this case dispute whether Plaintiffs have provided sufficient evidence to survive summary judgment on their Title IX claim. Defendant asserts Plaintiffs have not shown (1) that Jenna was denied access to educational opportunities or benefits; (2) that Defendant had "actual knowledge" of harassing activity; or (3) that Defendant was "deliberately indifferent" to any harassment of which it was aware. For its part, the United States has entered the

---

[6]The school was also informed that other students had been victimized by the same assailant.

fray to "clarify" the law argued by Defendant and claims that Title IX does not require individualized notice of a threat to a specific individual from a specific perpetrator and that even an isolated incident of sexual assault may constitute severe and pervasive harassment. Having carefully reviewed the record and applicable law, and duly considered the arguments raised by the parties and amicus curiae, the Court concludes that there is insufficient evidence in the record to present a jury question on Plaintiffs' Title IX claim.

Based upon Davis, and its predecessor Gebser v. Lago Vista Indep. School Dist., 524 U.S. 274 (1998) which discussed Title IX in the context of teacher-on-student sexual harassment, the Sixth Circuit has indicated that to establish a claim for student-on-student harassment under Title IX, a plaintiff must show "(1) that the sexual harassment was so severe, pervasive, and objectively offensive that it could be said to deprive the plaintiff of access to the educational opportunities or benefits provided by the school, (2) that the funding recipient had actual knowledge of the sexual harassment, and (3) that the funding recipient was deliberately indifferent to the harassment." Soper v. Hoben, 195 F.3d 845, 854 (6th Cir. 1999). Accepting for present purposes that an isolated event may be sufficient to establish the severe, pervasive and objectively offensive prong, see Vance v. Spencer County Pub. Sch. Dist., 231 F.3d 353, 259 (6th Cir. 2000), Plaintiffs' Title IX claim fails on the other two prongs.

In Davis, the Supreme Court indicated that for a school to be liable for student-on-student harassment, it must have actual knowledge of the harassment. In this case, both Plaintiffs and the United States assert that individual knowledge about a particular victim or perpetrator is not required and that the Defendant had "actual knowledge" based upon the 2000 Notice from the Department of Education and as a result of the kissing incident on September 26, 2006.

16

Post-Davis, some courts have held that, given the limitations on liability under Title IX, a school must be aware that a particular individual was subjected to a sexually hostile environment or that a particular individual was the perpetrator of sexual harassment. The more accepted view, and the one this Court adopts, is that, to be liable, "'the institution must have possessed enough knowledge of the harassment that it reasonably could have responded with remedial measures to address the kind of harassment upon which plaintiff's legal claim is based.'" Folkes v. New York College of Osteopathic Med., 214 F.Supp.2d 273, 283 (E.D.N.Y.2002)(citation omitted); see, Johnson v. Galen Health Inst. Inc., 267 F.Supp.2d 679, 687 (W.D. Ky. 2003)(collecting cases).

Even under a broad view of actual knowledge, the vanilla letter from the Department of Education is not sufficient. It speaks about events years earlier involving a different student at a different school and did not relate to claims of sexual harassment. It certainly did not portend the type of harassment that is alleged to have occurred in this case some eight years later. See, Winzer v. School Dist. for City of Pontiac, 105 Fed. Appx. 679, 681 (6th Cir. 2004) (a school district may not be liable under Title IX absent evidence that it ignored known acts of student-on-student sexual harassment).

Nor did Mr. Staehling hollering at the bus driver about the "kissing incident" and telling her to pay attention provide Defendant with actual knowledge as that term has come to be understood post-Davis. In Gebser, the case involving teacher-on-student harassment and upon which Davis heavily relies, the Supreme Court stated that in enacting Title IX, Congress did not contemplate unlimited recovery in damages against a federal fund recipient where that recipient is unaware of discrimination or harassment in its programs. Gebser, 524 U.S. at 287-288. Constructive notice of discrimination or harassment is not sufficient; there must be "'notice of the violation' to the appropriate person[.]" Id. at 289 (citation omitted). "An 'appropriate person' under § 1682 is, at a

minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." Id. at 290; see, Williams v. Bd. of Regents, 477 F.3d 1282, 1289 (11th Cir. 2006).

"In applying Gebser, the appellate courts have required actual knowledge by the school board itself, the school superintendent, or, at least, a school principal." Peer v. Porterfield, 2006 WL 3898263 *9 (W.D. Mich. 2006)(colleting cases). A school bus driver is not an "appropriate person" with authority for purposes of Title IX liability. See, Nelson v. Lancaster Indep. Sch. Dist. No. 356, 2002 WL 246755 at *4 (D. Minn. 2002).[7]

While the summary judgment record suggests that Defendant did not have "actual knowledge" of sexual harassment by virtue of the notice from the Department of Education or Beach's learning of the kissing incident, it is undisputed that the school did in fact have actual knowledge of the incident on October 5, 2006. The next question thus become whether the school district was deliberately indifferent to this harassment.

The Supreme Court in Davis indicated that if a school which receives federal funds does not engage in harassment directly, it can only be liable for damages if its deliberate indifference "'subject[s]' its students to harassment. That is, the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." Davis, 526 U.S. at 645. This language has been read by some courts to mean that a school is not liable under Title IX if no harassment occurs after a school receives notice of the harassment. See, Rost ex. rel. K.C.

---

[7] Moreover, Mr. Staehling's admonition to the bus driver to pay more attention because the student had allegedly kissed Jenna on that one occasion may not have suggested pervasive or severe harassment. See, Davis, 526 U.S. at 651 ("a plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities" and courts "must bear in mind that schools are unlike the adult workplace and that children regularly interact in a manner that would be unacceptable in adults").

Case 3:07-cv-00797   Document 90   Filed 09/12/08   Page 18 of 22 PageID #: 1023

v. Steamboat Springs RE-2 School Dist. , 511 F.3d 1114, 1123 (10th Cir. 2008); Rees v. Jefferson School Dist. No. 14J, 208 F.3d 736, 740 (9th Cir. 2000); Ross v. Corp. of Mercer University, 506 F.Supp.2d 1325, 1346 (M.D. Ga. 2007). Under such a reading of Davis, Plaintiffs in this case cannot survive summary judgment because there is absolutely no evidence that Jenna was subjected to sexual harassment on the bus after this incident. Quite the contrary, the undisputed evidence is that the perpetrator was taken off the bus and ultimately sent to another school and, at least during the 2007-2008 school year, a monitor was on Jenna's bus.

Notwithstanding a lack of further harassment after the October 5, 2006 incident, Plaintiffs claim that Defendant was deliberately indifferent to the report of harassment. They claim generally that Defendant failed to adequately investigate the matter and take adequate remedial measures, that the school should have revisited the whole issue of harassment on school buses, and the school should have done more to aid Jenna after the incident.

The Sixth Circuit has described the deliberate indifference standard under Title IX as follows:

> The recipient is not required to "remedy" sexual harassment nor ensure that students conform their conduct to certain rules, but rather, "the recipient must merely respond to known peer harassment in a manner that is not clearly unreasonable." Davis, 526 U.S. at 648-649, 119 S.Ct. 1661. The deliberate indifference standard "does not mean that recipients can avoid liability only by purging their schools of actionable peer harassment or that administrators must engage in particular disciplinary action." Id. at 648, 119 S.Ct. 1661. The standard does not mean that recipients must expel every student accused of misconduct. See id. Victims do not have a right to particular remedial demands. See id. Furthermore, courts should not second guess the disciplinary decisions that school administrators make. See id.

Vance, 231 F.3d at 260.

The Defendant in this case did not fail to act. While the investigation which occurred may have been prompted by Mr. Staehling speaking to the Metro police officer assigned to the school instead of being prompted by the principal, the fact remains that an investigation took place and, as a result, the fellow special education student/perpetrator was identified, was not allowed to ride the

19

same school bus again with Jenna or otherwise come in contact with her, and was ultimately transferred to another school.  See, Rost, 511 F.3d at 1122 ("Perhaps the district should have independently interviewed the boys involved instead of relying on Officer Patrick's investigation and periodic reports, but such an allegation would sound in negligence, not deliberate indifference"). While the parties dispute whether the principal actually looked into the well-being of Jenna, Plaintiff has presented nothing from which the Court can conclude that the Defendant ignored a known condition of Jenna.  See, Fitzgerald v. Barnstable Sch. Comm., 504 F.3d 165, 174 (1st Cir. 2007) (noting "[i]n hindsight, there may be other and better avenues that the [district] could have explored . . . [b]ut Title IX does not require . . . flawless investigations [or] perfect solutions").  While the alleged failure of the school in its follow-up to the October 5, 2005 incident may suggest negligence, this is not sufficient to met the deliberate indifference standard under Title IX.  Instead, for liability to attach, the school's response must be clearly unreasonable in light of the known circumstances. Williams v. Paint Valley Local School Dist., 400 F.3d 360, 367 (6th Cir. 2005).  Accordingly, summary judgment will be granted in favor of Defendant on Plaintiffs' Title IX claim.

## C.  **State Law Claim**

Having determined that summary judgment should be granted on Plaintiffs' federal claims, the question becomes whether the Court should entertain the remaining state law negligence claim. Federal district courts have "supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). When a district court has dismissed all claims over which it had original jurisdiction, the court has discretion to "decline to exercise supplemental jurisdiction" over state law claims with respect to which it initially asserted jurisdiction. 28 U.S.C. § 1367(c)(3).   The discretion in deciding whether to

20

exercise supplemental jurisdiction over state law claims is broad. <u>Musson Theatrical, Inc. v. Federal Exp. Corp.</u>, 89 F.3d 1244, 1254 (6th Cir. 1996).

When deciding whether to exercise supplemental jurisdiction, a court should consider factors such as judicial economy, convenience, fairness, and comity. <u>City of Chicago v. International College of Surgeons</u>, 522 U.S. 156, 173 (1997). However, "'in the usual case in which all federal law claims are eliminated before trial, the balance of factors to be considered ... will point toward declining to exercise jurisdiction over the remaining state-law claims.'" <u>Robert N. Clemens Trust v. Morgan Stanley DW, Inc.</u>, 485 F.3d 840, 853 (6th Cir. 2007)(quoting <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 350 n 7 (1988)). Thus, "it is ordinarily prudent for a district court that dismisses a plaintiff's federal claims to decline to reach plaintiff's state law claims" unless the concerns of judicial economy and avoidance of multiplicity of litigation overrides the notion that federal courts should not "needlessly decid[e] state law issues." <u>Sextella-Wright v. Sandusky City Sch. Dist.</u>, 2007 WL 451498 at *2 (6th Cir. 2007).

In this case, the concerns of judicial economy, convenience and fairness do not override the accepted principle that purely state law disputes should be decided in state court, absent the existence of a basis for federal jurisdiction. This case was removed to this Court in August 2007 and the most recent amended complaint was filed on March 7, 2008. While the parties have engaged in discovery, there is no suggestion that the same discovery will not be of benefit to the parties in relation to litigating the state law claim in state court. Accordingly, the Court will exercise its discretion and decline to entertain Plaintiffs' state law claim.

### IV.  <u>CONCLUSION</u>

On the basis of the foregoing, Defendant's Motion for Summary Judgment (Docket Entry No. 50) which seeks summary judgment solely on Plaintiffs' federal claims will be granted.

21

Accordingly, Plaintiffs' claims under 42 U.S.C. § 1983 for violation of the Fourteenth Amendment and their claims under Title IX, 20 U.S.C. § 1681 et seq., for deprivation of educational opportunities will be dismissed with prejudice. The Court declines to exercise supplemental jurisdiction over Plaintiff's state law negligence claim and will dismiss that claim without prejudice.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE